LANDRY, Judge.
Plaintiff, Denzil R. Murphy, has taken this appeal from the decree of the trial court granting him judgment in the sum of $563.45 in recompense of medical expense incurred but rejecting his claim for workmen’s compensation benefits allegedly due because of total and permanent disability reputedly sustained in a fall which plaintiff experienced March 19, 1962, in the course of his employment by defendant, Baton Rouge Coca-Cola Bottling Company, Ltd. Neither defendant-employer nor its compensation insurer, Liberty Mutual Insurance Company, have appealed or answered this appeal.
The learned trial court did not render written reasons for judgment but the decree in favor of appellant for certain medical *637 expense necessarily implies our esteemed brother below found plaintiff sustained an injury both accidental and compensable in nature. All other inferences suggested by counsel for both appellant and appellees in their respective briefs regarding whether the amount awarded appellant was for physicians’ fees, hospital expenses or compensation payments, are purely speculative.
In substance the present matter presents the following questions for appellate review : (1) whether or not plaintiff sustained an “accident” within the contemplation of the term as used in our workmen’s compensation statute; (2) did plaintiff’s alleged injuries result from the purported accident ; and (3) was plaintiff disabled as a result of injuries received in the asserted accident and if so, to what extent?
It is undisputed that if the alleged “accident” was in fact an accident, any resulting disability is compensable inasmuch as the incident in question occurred on the employer’s premises, during working hours, and at a time when appellant was actively engaged in the performance of duties incumbent upon him as defendant’s employee.
Plaintiff’s cause of action is predicated on the contention that while acting as defendant’s outdoor advertising manager he fell down a flight of stairs and landed in a sitting position as a consequence of which mishap he injured his back, sustained a mild brain concussion, suffered minor contusions of the body, principally of the low back and buttocks and sustained a right inguinal hernia necessitating surgery which in turn resulted in atrophy of plaintiff’s right testicle.
The crux of plaintiff’s case is the contention he is unable to perform the duties of his former employment without undue pain. More specifically, plaintiff maintains he suffers from pain in the lumbo sacral region caused by sprain and from a possible ruptured disc or aggravation of a pre-existing arthritic condition. In addition plaintiff asserts he experiences discomfort from the atrophied condition of his right testicle, said latter circumstance producing distress in his right groin and thigh and numbness in his penis and left leg to such degree he is unable to discharge the duties incident to his employment by defendant.
Defendant maintains plaintiff suffered no “accident” but fell as the result of a natural illness which precipitated the incident in question. Additionally, defendant contends plaintiff suffered no injury as a result of the purported accident and, alternatively, plaintiff’s disability, if any, was fully compensated by wages paid subsequent to the date of the mishap.
For some years prior to the alleged accident plaintiff was employed as supervisor of defendant’s advertising department. In such capacity plaintiff’s duties, though somewhat in dispute between the parties, may fairly be described as consisting primarily and basically of the obligation of supervision of the work of defendant’s employees charged with the duty of erecting and maintaining outdoor advertising. Essentially plaintiff was required to issue clean uniforms to the advertising crews when required, order, stock and issue paint and other materials and supplies needed in billboard and other outdoor advertising, select locations for signs, approve completed billboards and signs, answer requests for outdoor advertising and perform such other supervisory duties as were necessary to insure the proper performance of the duties of defendant’s sign crews. It is undisputed that in the course of his duties plaintiff was occasionally obliged to drive a light pickup truck. Plaintiff concedes that whereas he was not required to do heavy lifting of any nature he occasionally did so on a purely voluntary basis when he felt he could lend a hand to a sign crew. It is likewise conceded plaintiff was not a laborer and was not required to perform heavy labor.
Following the alleged accident of March 19, 1962, appellant remained in the hospital until March 25, 1962. Subsequently on April 2, 1962, he was pronounced able to return to work and did so on the following *638 day. It is conceded plaintiff was returned to light duty with certain limitations upon his activity. Plaintiff continued in this capacity but shortly began to experience pain in his right groin and on April 9, 1962, consulted Dr. W. Shewen Slaughter for this symptom. Following negative genitourinary tests and several examinations for hernia, Dr. Slaughter ultimately found plaintiff to be suffering from a right inguinal hernia, said diagnosis being made June 11, 1962. Thereafter, on July 17, 1962, plaintiff was hospitalized for a hernioplasty and after performance thereof was discharged from the hospital July 23, 1962.
It is conceded plaintiff was paid full wages from the date of his alleged accident March 19, 1962 to August IS, 1962, in addition to 3 weeks vacation pay due him. Plaintiff did not return to defendant’s employ following the hernioplasty. Instead plaintiff obtained employment in November, 1962, as a garden tool salesman for Montgomery Ward & Company in which capacity plaintiff was employed at the time of trial.
Adverting to the circumstances surrounding the incident precipitating this litigation, the record reveals that very shortly after plaintiff’s arrival for work at defendant’s plant on the morning of March 19, 1962, he went upstairs to deliver a hauling “dolly” to a fellow employee. In returning downstairs plaintiff fell on the concrete stairway and came to rest in a sitting position near the bottom of the stairs. Plaintiff summoned a fellow employee, Franklin P. Wisdom, who in turn invoked the assistance of another employee, Elton J. Dupuy. Because plaintiff was then slightly obese and weighed approximately 212 pounds, Wisdom and Dupuy enlisted the help of a third employee, Marvin Miller, placed plaintiff in an automobile and took him to a hospital.
Regarding the occurrence of an accident, Wisdom testified he had seen plaintiff earlier that morning and heard plaintiff’s cry for help “just a few minutes, just a minute or so after I’d left him.” He found plaintiff sitting on the fourth step from the bottom of the stairs (the sixth from the top) complaining that his head and back hurt. When Wisdom reached the scene and inquired what happened, plaintiff replied:
“ * * * Frank, I was on the top of the landing and, * * * I reached, I put my hand on the railing on the, on the left and lost my balance and went head over heels or turned a somersault and landed right here.”
Mr. Dupuy had seen plaintiff a minute or two before the accident and upon arriving at the scene observed plaintiff in a sitting position with his hands over his face apparently in pain. He also noted plaintiff’s clothing was disarrayed and dirty “like he had gotten dirt off the steps or someplace.” Upon inquiry plaintiff complained of pain, particularly of pain in his head. Plaintiff informed Mr. Dupuy that he had reached for the handrail and missed it and fell head over heels.
Plaintiff testified he started down the stairs and slipped on the top concrete step which had no safety tip or edge. He fell in what seemed a double somersault and landed in a seated position near the bottom of the stairs.
Upon arrival at the hospital plaintiff was taken to the emergency room where he was examined by Dr. W. Shewen Slaughter, defendant’s “company doctor” who was summoned by some member of defendant’s staff.
The results of Dr. Slaughter’s initial examination appear in the following excerpt taken from his testimony and appearing at Pages 137-139 Transcript:
“A Well, when I first saw Mr. Murphy he told me that he had fallen down some stairs but he was very hazy as to exact, exactly what had happened to him. I would say that he was sort of mentally confused at that time, and I had seen Mr. Murphy several days before that in my office and knew at that *639 time that he had, on that particular occasion he had high blood pressure, and after examining Mr. Murphy I didn’t know really how much of his symptoms and how much of his findings were due to his fall or whether perhaps he had had some kind of cerebral vascular accident. He had some contusions on his lower spine and he complained bitterly of pain in his chest, pain in his back, pain in his legs, and headache. His blood pressure at that time when I saw him was 250 over 120, and I ordered his hospitalization and asked Dr. Harold Voss, an internist, to come in and see him. Now I knew that Dr. Voss, Sr., Charles Voss, Sr. had seen this man on several occasions and that was the reason why I got Dr. Harold Voss, because he is an internist and specializes in diseases of such things as cerebral vascular accident, and so forth, and I was not too sure in my mind exactly what had happened to this man because Mr. Bock had told me on the telephone that he didn’t know what had happened to him, and I wanted to be sure that we weren’t dealing — although Mr. Murphy exhibited nothing except the haziness, his mental haziness, and so forth and so on, he had no signs like any quality of pupils of anything of that nature that would indicate that he had a cerebral vascular accident. Neither did he have any paralysis. However sometimes these things are not very apparent and I wanted an internist to see him and I asked Dr. Voss to come in and see him and follow him. And it was really my opinion that most of his problems at that particular time were due to this mental confusion and possibly the high blood pressure. However after — well, I’m going a little fast for you here.
“Q That’s all right, sir. Go ahead, doctor.
“A After following Mr. Murphy for several days with Dr. Voss and Mr. Murphy becoming less mentally confused and the headache clearing up and complaining of pain in his chest, pain in his hips, pain in his low back, it became apparent to me that Mr. Murphy had not had a cerebral vascular accident and that his blood pressure was high probably due to the fall plus an inherent tendency to high blood pressure, because my records show that Mr. Murphy had high blood pressure in 1951 when I first saw him. His blood pressure at that time was 210 over 130.”
Dr. Slaughter’s testimony regarding the vascular accident is of interest because ap-pellee stoutly maintains this physical condition was the cause of plaintiff’s fall. In this connection, defendant argues plaintiff suffered a “stroke” and any injuries or disabilities plaintiff may have incurred are attributable to this natural cause. Defendant maintains plaintiff’s blood pressure was severely elevated during the week preceding March 19, 1962, during which time on Friday, March 16, 1962, plaintiff’s condition was aggravated by emotional upset arising from a reprimand by plaintiff’s superior who indicated an investigation would be made of complaints lodged against plaintiff following which it would be determined whether plaintiff would continue in defendant’s employ. Defendant advances the contention plaintiff’s physical condition thus aggravated, resulted in a fainting spell or stroke near the stairs of defendant’s establishment.
We believe, however, the evidence preponderates in favor of the conclusion plaintiff did in fact suffer an accident. *640 Plaintiff himself so testified and his account of the occurrence given to Wisdom and Dupuy immediately after the incident tend to corroborate plaintiff’s version of the event. Plaintiff is further confirmed by Dupuy’s testimony to the effect he noted the disarrangement of plaintiff’s clothing and soil thereon which are indicative of a fall. The fact that plaintiff may have been somewhat “hazy” regarding the precise circumstances is, we believe, understandable in view of the circumstances shown. Moreover, it is clear from the record that upon examination at the hospital plaintiff was observed in severe pain and was found to have suffered contusions of the lower spine and buttocks. While the circumstances related do not conclusively establish an accident, we are of the view they suffice inasmuch as plaintiff is not required to prove an accident beyond a reasonable doubt but merely by a preponderance of evidence.
The remaining qrtestions, namely, whether plaintiff sustained injuries as a result of the accident and the disability, if any, resulting therefrom will be considered together.
The testimony, fairly analyzed, reveals plaintiff is able to perform the duties of his former position, the genuine issue is whether he is able to do so without undue or appreciable pain. In this regard plaintiff invokes the rule expressed in Thomas v. Gates, Incorporated, La.App., 157 So.2d 263, from which we approvingly cite the following:
“Also, the law does not expect and it does not contemplate that a worker, in order to make a living, must work in substantial pain, and he is considered as being totally disabled, under the provisions of our workmen’s compensation law, if he is unable to work without enduring substantial pain and suffering caused by a work-connected injury as contemplated by that law.”
The consensus of medical testimony is that plaintiff suffered a back strain and aggravation of a pre-existing arthritic condition. While some of the medical authorities are of the opinion plaintiff may have sustained a ruptured disc, the experts are by no means in agreement on this latter diagnosis.
In substance plaintiff felt he was able to resume the duties of his former employment. When asked, however, if he could do so without pain, he replied, “Well, now that I don’t believe.” Plaintiff also testified he suffers pain in his back but by means of a brace which he tightens as much as he can, he manages to “keep going.” Plaintiff also maintains his right testicle aches constantly and he frequently experiences pain in his right leg as well as pain and numbness in his penis and left leg. According to plaintiff he also takes aspirin and other mild analgesics for pain and in this regard he is corroborated by his wife.
Dr. W. Shewen Slaughter, General Surgeon, testified that upon examination March 19, 1962, plaintiff was found to be suffering from extremely elevated blood pressure, contusions of the lower spine and complaints of back and leg pain. Dr. Slaughter called in consultation Dr. Harold M. Voss, whose specialty is Internal Medicine. On April 2, 1962, Dr. Slaughter felt plaintiff was able to resume his former duties considering he understood plaintiff’s work entailed no heavy strenuous physical labor or arduous straining or lifting. Although plaintiff complained of pain in his right testicle prior to the hernioplasty, plaintiff requested no treatment or medication for this symptom and repeated examination at that time did not reveal the hernia which developed following plaintiff’s return to work April 3, 1962. Dr. Slaughter was of the opinion the hernia discovered June 11, 1962, following plaintiff’s return to work, was also caused by plaintiff’s fall. Despite the opinion of other medical authority that plaintiff’s right testicle was atrophied, Dr. Slaughter considered it was merely “riding high.” Dr. Slaughter agreed with all the other medical authorities, however, that the *641 condition of plaintiff’s right testicle was due from a nerve involvement resulting from the hernioplasty and the pain emanating from this source would continue indefinitely. In summary, Dr. Slaughter testified plaintiff was able to resume his former employment without undue pain since April 2, 1962, with the exception of the six week period during which plaintiff was recuperating from the subsequent hernioplasty.
Dr. Harold M. Voss, internist, testified that on September 3, 1962, he wrote defendant insurer suggesting an orthopedic evaluation of plaintiff’s complaints of back and leg pain and that in the absence of such evaluation the validity of plaintiff’s complaints could neither be confirmed nor denied. In essence he stated he considered plaintiff disabled on the basis of plaintiff’s complaints.
Dr. Charles H. Voss, General Surgeon, an acquaintance of plaintiff for several years preceding the accident, stated he was consulted by plaintiff merely as a friend. From his discussion with and cursory examinations of plaintiff, he considered plaintiff’s complaints of pain consistent with the injury suffered. Dr. Voss, however, did not testify with regard to plaintiff’s alleged inability to perform the duties of plaintiff’s employment without undue, appreciable or substantial pain.
Dr. James F. Halley, orthopedic surgeon, called on behalf of plaintiff, testified he examined plaintiff only on July 5, 1963. He diagnosed plaintiff’s condition as lumbo-sacral sprain which was subsiding and would, in his opinion, continue to subside. He felt there would be no permanent disability as a result of the accident. He found no objective symptoms of pain but based on plaintiff’s subjective complaints he felt the injury was disabling to a person who was required to do considerable back bending and stooping. With regard to plaintiff’s ability to do what a man of plaintiff’s age should be able to do, Dr. Halley stated plaintiff might experience pain on excessive lifting for long periods of time or climbing and the performance of similar functions over an extended interval.
Dr. William E. Smith, Orthopedic Surgeon, called on behalf of appellees, stated he examined plaintiff only on September 14, 1962. He found plaintiff suffering from degenerative or osteoarthritis of the low back and also believed plaintiff had degenerative disc disease of long standing involving the L/4 and L/5, S/1 interspace. He felt that as of the date of his examination plaintiff was able to resume all duties incident to plaintiff’s employment as advertising manager of defendant corporation notwithstanding plaintiff’s complaints of pain in the low back and right testicle. Checks conducted by Dr. Smith indicated plaintiff’s complaints to be inconsistent in that plaintiff evidenced back pain upon performance of certain manipulations which could not cause discomfort in that area. Dr. Smith concluded plaintiff was either misinterpreting the true source of his pain or thought he had pain which was nonexistent. He further observed muscle spasm which tests revealed were voluntary rather than involuntary. Dr. Smith did not attempt to evaluate plaintiff’s complaints with regard to plaintiff’s right testicle. Upon being explained the nature of plaintiff’s duties he was of the opinion such functions could be performed by plaintiff without undue pain or discomfort.
In addition to Thomas v. Gates, Inc., supra, plaintiff has cited numerous other decisions holding that an employee is considered totally and permanently disabled, under the provisions of our workmen’s compensation statute, if he is unable to perform the duties of his occupation without enduring substantial or appreciable pain. Plaintiff placed particular reliance upon Brannon v. Zurich General Accident & Liability Ins. Co., 224 La. 161, 69 So.2d 1, and cases therein cited.
The applicable rule has been expressed by Professor Malone, in Louisiana Workmen’s Compensation Law and Practice, *642 1962 Pocket Part, page 124, § 278, which has been quoted in Powell v. Travelers Insurance Company, La.App., 117 So.2d 610:
“Where the physical injury has an appreciable effect on the worker’s capacity to discharge the operations performed by him prior to the accident, or where it results in substantial pain, the medical estimate of a percentage disability will be rejected, and compensation for total disability will be awarded.”
In Carlino v. United States Fidelity & Guaranty Co., 196 La. 400, 199 So. 228, the Supreme Court held “an injured workman may be deemed totally disabled, within the meaning of the statute, even though the necessity of supporting his family compels him to do work which causes great pain and suffering.” (Emphasis added.)
Wilson v. Fogarty Brothers Transfer Company, La.App., 126 So.2d 6, points out that the pain contemplated by the applicable rule has been variously characterized in the jurisprudence as “substantial pain”, “great pain”, and “considerable pain”, and that “recovery may be allowed only where the pain which results is more than those ordinary aches and pains to which all flesh is heir.”
Considerable reliance is also placed by appellant on Reed v. Calcasieu Paper Company, 233 La. 747, 98 So.2d 175, wherein a workman suffering a hernia underwent corrective surgery producing scar tissue which affected the spermatic cord causing almost complete atrophy of the cord and testicle. The resulting pain was not sufficiently severe to necessitate his confinement but was, nevertheless, substantial and continuous to such extent as to require the use of mild sedatives. The Reed case, supra, however, is clearly distinguishable from the case at bar considering the cited authority concerned a common laborer whose duties required the performance of strenuous, arduous and laborious work which he was no longer able to perform. In the case at bar plaintiff’s duties were primarily, principally and almost exclusively supervisory and sedentary in nature. As previously shown, his regular duties required no heavy, strenuous lifting or raising. Neither did his work require constant lifting, stooping or bending. Plaintiff did occasionally drive a light pickup truck but his position was essentially a “desk job” which included answering requests for outdoor advertising, issuing uniforms, ordering stock for the sign crews, selecting sites for billboards and other similar outdoor advertising media and inspecting and approving completed signs. The record is clear beyond doubt that plaintiff was basically a supervisor and adequate laborers were provided by plaintiff’s employer to do whatever physical labor necessary in the erection of signs. Any such work performed by appellant was both infrequent and voluntary.
We believe the testimony favors the conclusion plaintiff is capable of performing such duties without undue, appreciable or substantial pain, therefore, he is not disabled within the meaning of the applicable compensation statute.
The record is clear, however, plaintiff’s lumbo-sacral sprain and hernia resulted from the accident and plaintiff is therefore entitled to medical expenses incurred as a result thereof. It is equally clear plaintiff is entitled to workmen’s compensation benefits for the six week period following the hernioplasty during which interval he was unable to work. The operation was performed July 17, 1962. Six weeks subsequently plaintiff was able to return to work. As previously pointed out, plaintiff was paid full wages from March 19, 1962, to August 15, 1962, and additionally received three weeks vacation pay to which he was admittedly entitled.
It is settled jurisprudence that an employer is entitled to credit against compensation due for unearned wages paid in lieu of compensation. Carlino v. United *643 States Fidelity & Guaranty Co., 196 La. 400, 199 So. 228; Daigle v. Higgins Industries, La.App., 29 So.2d 374.
An employer, however, is not entitled to credit against compensation due for pension payments. Rhodus v. American Employers Ins. Co., La.App., 9 So.2d 821. Although the rationale of the rule announced in the Rhodus case, supra, does not appear to he stated therein, it seems obvious that benefits accruing to an employee by way of a pension plan are considered earned over a long period of time and are therefore totally unrelated to compensation benefits to which an employee may be entitled as a matter of law. We view accumulated vacation pay in the same light and believe that all other so called “fringe benefits” which are in reality “earned wages” must be similarly regarded.
Plaintiff established medical expense incurred in the sum of $1,130.45, which amount he is entitled to recover with interest thereon at the rate of Five (5%) per cent per annum from date of judicial demand, until paid. In addition, plaintiff is entitled to two weeks compensation at the rate of $35.00 weekly from the period August 15, 1962 to August 29, 1962, together with interest at the rate of Five (5%) per cent per annum on the sum of $35.00 from August 22, 1962, until paid, and interest at Five (5%) per cent per annum on the sum of $35.00 from August 29, 1962, until paid.
Considering the circumstances of the instant case, we do not regard defendant’s failure to pay compensation as arbitrary, unreasonable or capricious, consequently, plaintiff’s claim for attorney’s fees and penalties must be rejected.
Accordingly, it is ordered, adjudged and decreed the judgment of the trial court is hereby amended and revised and judgment rendered herein in favor of plaintiff, Denzil R. Murphy, and against Baton Rouge Coca-Cola Bottling Company, Ltd. and Liberty Mutual Insurance Company, in solido, in the sum of $1,200.45, together with interest at the rate of Five (5%) per cent per annum on the sum of $1,130.45 from date of judicial demand, until paid, and with interest of Five (5%) per cent per annum on the sum of $35.00 from August 22, 1962, until paid, and interest at the rate of Five (5%) per cent per annum on the sum of $35.00 from August 29, 1962, until paid, and all costs.
It is further ordered, adjudged and decreed that except insofar as the same is hereby amended and revised, the judgment of the trial court is affirmed.
Amended and affirmed.